**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Cr. No. 25-cr-146** |
| | ) | |
| **KIYIEL KEARNEY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## SENTENCING MEMORANDUM

Kiyiel Kearney. through undersigned counsel, respectfully submits this memorandum requesting that the Court consider the many struggles he has faced throughout his life and the various legal arguments made in this sentencing memorandum in determining a fair and just sentence. Although Mr. Kearney is being sentenced for two guns, one in District Court and one in Superior Court – this Court should sentence him as if both cases were for federal offenses. As explained below, following those principles, he would be facing a combined offense level of 18 to 24 months. Under those guidelines and applying the 3553 factors, an appropriate sentence would be a year and a day.

### Background

It is not an exaggeration to say that Mr. Kearney has had to overcome challenges since conception. DCPS records reflect that he was born at 5 lbs 8 ozs to a 16 year-old mother who used drugs throughout her pregnancy, most notably PCP. His mother was unable to care for him and he was raised by his grandmother and aunt from birth, maintaining some contact with his biological parents. Although he was able to reach developmental milestones as an infant and toddler, he faced near immediate problems once he reached school. By the time he was old enough to receive educational testing, it was determined that he was Learning Disabled.

In his younger years, Kiyiel demonstrated high effort but little success.  His school records reflect that would struggle with reading and math, despite trying very hard.  Educational testing revealed basic psychological process disorders in understanding language.  Though he did not have cognitive testing in his high school years, his early education testing displayed Significantly Below Average cognitive function.  Ex 5. at 147.  And his standardized progress testing captured his limitations.  For example, when he was nearly 15, he was assessed to be closer to 11.  His academic progress scores when he was 16 placed him at a 5th grade level across the subjects that are typically assessed. Ex 5, D.C. Public School Records.

Around that age, records show that Kiyiel was placed at Cardozo Education Campus because of his Learning Disability in a specialized program designed to lead to a two-year associate's degree in community college and also encouraged his goals of being a music engineer so he could perform and produce rap music videos.  Ex. 5 at 17.  The early results were exceptional.  In the 10th grade, Kiyiel was receiving modifications and accommodations in an inclusion classroom and received an 85% in Geometry in Term 1.  Ex. 5 at 14.  He was reportedly a "pleasure to have in class" "demonstrate[d] appropriate relationships with peers and adults" "perform[ed] well in math when given explicit instruction."  Ex. 5 at 4.  His language classes proved to be more of a struggle but he remained engaged in those classes through the first Term and he received a C.  His IEP remarked:

> Based on the WJIV Tests of Achievement, RI testing, classroom based assignments and assessments and benchmark assessments, Kiyiel is in need of specialized instruction in the area of reading. Kiyiel's disability affects his comprehension and processing of on grade level reading content . Kiyiel benefits from teacher modeling, graphic organizers, printed notes, high interest reading material that parallel's grade level texts, scaffolding textual information and utilization reading strategies (visualization questioning, prediction, inferencing) when reading a text. Kiyiel requires the provision of modifications and accommodations to continue her progression within the general education environment.

Ex. 5 at

The second Term however was in the fall of 2020 when schools were shut down due to the coronavirus pandemic and Kiyiel suffered through the same struggles as many students around the world. But as a special education student suffering from a disability, the disruption had an oversized impact on his education and his social development. Though this was a common phenomenon, it hit hardest among those like Kiyiel:

> Robust research supports a complex interaction between disability and other social categories including race, gender, poverty, and linguistic status, whereby youth from socially advantaged backgrounds have greater access to disability diagnosis and education ser-vices compared to their peers [31]. Challenges with changing educational experiences due to COVID-19 have been exacerbated by individual, historical, and structural barriers including increased financial hard-ships, amplified housing, food, or healthcare in-securities, unmet mental health needs, and pre-existing access issues, all of which perpetuate systemic in-equities for students with [Special Education Needs and Disabilities ("SEND")] and students of color with SENDs especially.

Exh. _, at 3, *Dvorsky, Schroff, et. al*, "Impacts of COVID-19 on the school experience of children wand adolescents with special educational needs and disabilities" Generation Covid: Coming of Age Amid the Pandemic (2024).

In addition to the challenges Kiyiel suffered as a special education and learning disabled student, limited family involvement became a challenge for students like him as well: "Although it is well recognized that positive home-school communication is protective for students with SENDs, family engagement and advocacy efforts in support of youth with SENDs is typically shaped by inequality for historically minoritized students and families." *Id.*

Kiyiel's school records reflect the very struggles identified by research that focused on the problems confronting special education educators during the pandemic. The Center on Reinventing Pubic Education collected the "best available evidence on how the COVID-19 pandemic has affected America's students" and in particular students with disabilities and concluded that: 1) students with disabilities did not receive the same quantity and quality of

specialized educational services due to shortened days and virtual learning (true of Kiyiel); 2) such students had higher rates of absenteeism which had greater impact (true of Kiyiel); 3) districts struggled most when supporting those with learning disabilities (like Kiyiel); 4) the negative impacts were worst for the youngest (preschoolers aged three and up) and young adults nearing 21 (like Kiyiel).

It is thus not surprising that a young man who was showing promise when he enrolled at Cardozo in late 2019 had essentially stopped attending school three years later even though schools were fully reopened. He was not alone. And in that time period, crime, particularly around his age group, had become rampant. To his credit, Kiyiel did not become involved in the violent crimes like carjackings and homicides that defined the District during that period. But as the incident on the 1300 block of Columbia Road NW showed, especially around that time, he was also exposed to significant gun violence and felt it necessary to carry a gun to protect himself.

Kiyiel has grown and matured significantly since that time. Rather than justifying breaking the law, he knows that he needs to leave the District to begin his life anew. His goal is to be law abiding, productive and to be safe. He thus intends to live in Fredericksburg with his girlfriend where he can focus on his art and on working towards a trade.

Mr. Kearney has faced a set of unfortunate realities, but he is focused on doing what he can to avoid what placed him in the position to commit this crime. Because while it was illegal for Mr. Kearney to possess a firearm, it certainly was not wrong. The handgun, "the American people have considered… to be the ultimate self-defense weapon." *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008). And while that possession is a crime, it was entirely reasonable for him to believe that this crime could potentially save his or a loved one's life.

But Mr. Kearney is now a grown man with many responsibilities.  He has been away for his family for a year, paying his debt to society.  He looks forward to building upon the promise and hope that he had embarked upon before the pandemic.

### **ARGUMENT**

In this case, Mr. Kearney respectfully submits that the factors under § 3553(a) warrant a sentence of 18 months incarceration.  To begin, the Court should sentence Mr. Kearney to concurrent terms, consistent with the policy of the Sentencing Guidelines.  Although Mr. Kearney pleaded guilty to a firearm offense charged in Superior Court, as well as the offense originally charged in this Court, he did so at the request of the government and for the purpose of judicial efficiency.  Nothing about the structure of the plea agreement alters the policy rationale of the Sentencing Guidelines described below.

The government justifies its draconian request for a forty-eight month sentence of incarceration primarily by alleging facts of ***another*** crime that Mr. Kearney was ***not*** charged with, was ***not*** convicted of, and did ***not*** agree to committing.  It devotes the majority of its Nature and Circumstances of the Offense argument and its submitted exhibits to an incident where individuals approached and threatened Mr. Kearney with weapons, ultimately opening fire at him.  Shotspotter immediately alerted law enforcement to the incident and video was recovered and Mr. Kearney was arrested later that day for the unrelated charged offense. Nevertheless, Mr. Kearney was not charged with any offense related to the incident on video[1].

---

[1] Given the government's new allegation that Mr. Kearney "randomly" fired a gun that he was never formally accused of illegally possessing, the defense has requested *Brady* information about evidence in the possession of all law enforcement relating to the investigation of that shooting and the identity of the individuals who were shooting at Mr. Kearney.  The government has not provided any information beyond the limited discovery that was initially provided.

Initial discovery did show that individuals other than Mr. Kearney left at least 86 expended shell

I.      **The guidelines calculation**

As reported by the PSR and noted in the Plea Agreement, the parties do not dispute the calculated guideline range of 18 to 24 months for the 922 g offense and 10 to 28 months on the D.C. Code gun offense.  The parties' primary dispute is over whether the Court should apply follow the principles set forth by the Sentencing Guidelines.  The government does not mention the Guidelines' policy, much less address the purposes behind them.  Given that the firearms guideline is explicitly in U.S.S.G. §3D1.2(d), there is no justification to sentence Mr. Kearney to consecutive sentences in a case brought to District Court.

II.      **The guidelines do not incorporate recent understanding about the culpability of youngsters with underdeveloped minds in criminal offenses.**

It is noteworthy that Mr. Kearney was 19 and 21 years old at the time of these offenses. He had not yet committed the conduct for the federal offense in Virginia at the time of the first offense.  The Sentencing Guidelines do not reflect an appreciation for what has now been widely recognized as the brain development of young adults and the impact of that development on judgment.  §4A1.1, which does little to distinguish young adults from older offenders, generally reflects outdated and disproven assumptions about brain function and development.

Within the context of teenagers, the Supreme Court has recognized developments in psychology and brain science showing that juveniles (1) "have a lack of maturity and underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; (2) "are more vulnerable to negative influences and outside pressures, including from their family and peers," "have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings"; and (3) possess character traits

---

casings, most if not many from bullets fired in Mr. Kearney's direction.

that are "less fixed" than those of an adult.  *Miller v. Alabama*, 567 U.S. 460, 471 (2012)

(quotation marks and citations omitted).  As a result, the Court has concluded that juveniles

"have diminished culpability and greater prospects for reform."  *Id*.; *see also Roper v. Simmons*,

543 U.S. 551, 569-70 (2005).

Other studies warn against drawing an arbitrary age cutoff that assumes a person sense of

responsibility switches on at a particular birth date.  Research shows that "psychosocial

capabilities that improve decision making and regulate risk taking—such as impulse control,

emotion regulation, delay of gratification, and resistance to peer influence—continue to mature

well into young adulthood."  James C. Howell et al., *Bulletin 5: Young Offenders & an Effective

Response in the Juvenile & Adult Systems: What Happens, What Should Happen, & What We

Need to Know*, Doc. No. 242935, at 17, Papers From the Study Group on Transitions From

Juvenile Delinquency to Adult Crime, Nat'l Inst. Of Just., U.S. Dep't Of Just. (July 2013)

(unpublished) (citation omitted).  Thus, "[y]oung adults simply do not have the physiological

capacity of adults over age 25 to exercise judgment or control impulses," *id*. at 18, and it is

"difficult to justify applying permanent or long-term sanctions to young offenders," including

young adults in their early twenties, Carrie Mulford, *Explanations for Offending*, Nat'l Inst. Of

Just., U.S. Dep't Of Just., 2 (May 2014).

The Sentencing Guidelines fail to consider or account for this research.  By contrast,

"[r]elying on both the scientific evidence and the societal evidence of national consensus," lower

courts have "conclude[d] that the hallmark characteristics of juveniles that make them less

culpable also apply to 18-year-olds." *Cruz v. United States*, 2018 WL 1541898, at *25 (D. Conn.

Mar. 29, 2018); *see also id.* at *23-25 (discussing uncontested, credible expert testimony that the

scientific findings that underpin conclusions about those under the age of 18 also apply to 18-

7

year-olds).

This is of course especially true for an individual like Mr. Kearney who also suffers from learning disabilities and depression.  Accordingly, it is contrary to both conventional wisdom and brain science to impose increased sanctions on Mr. Kearney after he pleaded guilty to a crime that was lawfully possessing a firearm.

### III.    The Appropriate Sentence is concurrent terms of 18 months incarceration plus one year of supervised release.

Concurrent sentences are appropriate in this case and were these cases both in District Court, the proposed sentence would be run concurrent to one another if it were compliant with the Guidelines.  When sentencing a defendant, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider.  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a).  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range.  *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.).  Recently, a U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. *Thus, it is crucial that judges give careful consideration to every*

> *minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.*

*United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at \*3-4 (D. Md. Feb. 18, 2020) (emphasis added).

### A.  The History and Characteristics of Mr. Kearney

Mr. Kearney is a 22-year-old man who has faced significant challenges throughout his life.  Those challenges began at the earliest stages of his life and he suffered from cognitive deficiencies that were likely a result of the environment in which he developed as a fetus.  He was raised by his grandmother with help from his aunt, who guided him through a difficult educational experience, made worse by cognitive limitations.

And though he has had a recent criminal record, it is notable that his first conviction did not come arose from an arrest in April 2021.  That was the time when the effects of the pandemic had taken hold and Mr. Kearney was essentially foreclosed from going to school or finding work.  At the time, he was a tenth grader with aspirations of an associate's degree in music engineering.  But as a young man who had been determined to overcome his learning disabilities at the Cardozo Education Center, virtual learning would prove to be too much of a challenge.

Things got worse in 2023 when Mr. Kearney's grandmother, his only caregiver and his "best friend" suffered from a stroke.  She ultimately succumbed to complications with heart issues.  He wears a tattoo of her image on his arm in her memory but those around him report that he fell into deep depression after her passing.  She was an extreme loss for Kiyiel, not just as his closest companion but as a moral guide and adviser of all things in life.

In his young adulthood, Mr. Kearney has found an outlet in music and he is fortunate to be talented in the field.  He has directed his musical efforts towards individuals like him – at risk youth who have struggled through socio-economic challenges.  Ex.  2.  While many have

9

aspirations in the music industry, Mr. Kearney's 2024 PSR reports a monthly income of $3500 from his work. PSR at ¶77.

At the same time, he has plans to move to Fredericksburg to escape the violence of the District and to take advantage of the stable life that his girlfriend has built.  She is a home health care aide that also works as a ride-share driver.  She provides emotional support and a mature influence that reflects Mr. Kearney's desire to move past this phase of his life.

Though Mr. Kearney has a criminal record that mirrors the difficult benchmarks in his adulthood, his offenses have only been possessory and non-violent.

**B.  The Nature and Circumstances of the Offense**

Possession of a firearm is not a violent offense, as a matter of fact or law, as "[n]either the act of possessing a weapon nor the fact of being a felon is in itself a crime of violence." *United States v. Gloster*, 969 F. Supp. 92, 98 (D.D.C. 1997); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2197 (2019)("possession of a gun can be entirely innocent."); *Johnson v. United States*, 135 S. Ct. 2551, 2563 (2015) (J. Thomas, concurring)("Under conventional principles of interpretation and our precedents, the offense of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under the residual clause of the Armed Career Criminal Act (ACCA)."); *Staples v. United States*, 511 U.S. 600, 611 (1994).  Therefore, imprisonment for the purpose of incapacitation is similarly not necessary or warranted.

Nor is possession of a firearm a crime of violence[2]  In 2018, 21% of this District's court

---

[2] "The federal court for the District handled 392 criminal cases of all kinds in 2018, including 83 felon-in-possession gun cases and 16 gun-related interstate robbery cases, according to court records and prosecutors." Washington Post Article, also available at https://www.washingtonpost.com/local/legal-issues/us-to-prosecute-districts-armed-ex-convicts-in-federal-court-in-surge-against-gun-violence/2019/02/05/1f518926-2363-11e9-90cd-dedb0c92dc17_story.html (last viewed on March 9, 2020).

docket were felon in possession cases,[3] compared to 10% nationwide.[4] The 2025 firearm was found in Mr. Kearney's waistband and the 2023 firearm was discovered underneath Mr. Kearney in a car in which he was seated. There is no evidence that he ever pulled out either gun, fired either gun or brandished either gun. His conduct did not involve violence or involvement in a drug ring. He is not a member of a gang or a leader of a drug organization. It is beyond dispute that the offenses to which Mr. Kearney *pleaded guilty to* are purely possessory offenses that do not involve the firing of any gun.

The government, however, has chosen to insert a separate firearm and incident into this offense, asking this Court to assess whether it has demonstrated, by a preponderance of the evidence, whether Mr. Kearney illegally possessed another firearm and acted in a manner that justifies a higher sentence. First, the manner in which the government has chosen to prosecute this offense does not absolve it from providing Mr. Kearney due process. It should not and cannot be permitted to elude its *Brady*, Due Process Protections Act and Rule 16 obligations by tacking on new allegations to a sentencing memorandum.[5]

These omissions are meaningful. Aside from the fact that defense counsel is handicapped by now attempting to defend these allegations years after the fact after placing resources only upon the facts before the Court, the video itself tells only a sliver of the story. For example,

---

[3] See footnote 1, supra.

[4] Nationwide, gun possession offenses represented approximately 10% of the crimes reported to the U.S. Sentencing Commission in FY 2018. See U.S. Sentencing Commission Quick Facts Felon in Possession FY 2018, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Felon_In_Possession_FY18.pdf (last viewed March 9, 2020).

[5] Although the government has provided surveillance footage and some evidence logs related to the shootings, the government has not provided body worn camera footage, ballistics or any investigative information regarding the many identifiable individuals that were on the scene that evening. From general experience, counsel believes that there is a substantia amount of investigation in the possession of law enforcement related to this incident that has not been provided by the government.

before the shooting, no fewer than twelve individuals appear to begin to surround Mr. Kearney,

who seems to be alone.  It is not long before the video reveals that several of them are armed.

The video does not have audio that recorded what was said before the shooting.



The video then shows one of the individuals continuing to confront Mr. Kearney and

follows him around the parking lot even as he continuously backs away.  Mr. Kearney retreats all

the way to the end of the parking lot, speaking to that man before he defensively shoots.

12



From another angle, three associates of the man encircled in blue above are armed and open fire within seconds. One of them appears to have an AR type weapon.



Shell casings recovered indicate the volume of gunfire apparently fired in the direction of Mr. Kearney.







All of these shell casings came from weapons that appear to be fired at Mr. Kearney. Only three casings were recovered that were consistent with a "long gun" that the government alleges was possessed by Mr. Kearney. Whatever this evidence demonstrates, it is far from conclusive that Mr. Kearney "randomly" fired a gun – the video suggests that Mr. Kearney was fully retreating from a group of armed men, at least one of whom was persistently confronting him immediately preceding the incident.

In any event, the government's decision **not** to charge Mr. Kearney with an assault offense from the inception of this case speaks volumes as to its ability to prove its case, its understanding of what actually happened and the reliability of its evidence. The Court should

reject the government's attempts to back door Due Process safeguards and ignore these allegations unless and until the government brings sufficient evidence to actually prosecute Mr. Kearney or to at least provide him with the information required.

### C. The Need for the Sentence Imposed

18 U.S.C. § 3553(a) directs the Court to consider four objectives of federal sentencing to impose a sentence that is "sufficient, but not greater than necessary" to achieve those goals. In this case, the Court must determine what punishment is necessary. Mr. Kearney submits that concurrent 18 month sentences (in addition to the sentence that he will receive from the Eastern District of Virginia) are sufficient but no greater than necessary. The first purpose of sentencing is to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Mr. Kearney accepted responsibility for his actions and is sincere in his desire to start a new life.

Another purpose of sentencing is to "afford adequate deterrence." *Id.* at § 3553(a)(2)(B). While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence shows that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice (May 2016) at 1-2. Research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original). Significantly, "the crime prevention benefit falls far short of the social and economic costs," *id.* at 2, especially in light of the fact that U.S. Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety,"

15

*Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst. (Jan. 2016) at 21.  *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardoza J. Conflict Resolution 421, 447-48 (2007) ("Certainty of punishment is empirically known to be a far better deterrent than its severity.  Moreover, to Mr. Kearney, the specific deterrence from his actions cannot be compartmentalized between incarceration from his federal case in the Eastern District to his first possession offense which occurred earlier in time.

The government argues that Mr. Kearney's record demonstrates that he is not sufficiently deterred.  But the government ignores both the circumstances of Mr. Kearney's past offenses and the timing of his crimes.  Mr. Kearney is exceptionally young, cognitively disabled and disadvantaged in every considerable way.  He consistently showed significant effort in school until he was derailed by the pandemic.  His crimes were possessory but Mr. Kearney is a small man and, in a time that everyone recognized as particularly violent in the District, he felt the need to arm himself – an instinct that was proven correct when he was attacked by multiple armed gunmen. Deterrence, that is, his recognition that he can no longer possess firearms, is best expressed through his plans when he is released – to get out of the District and to go as far away as he reasonably, possibly can.

### D.  A Sentence Below the Guideline is Not an Unwarranted Sentencing Disparity

Concurrent guideline sentences would not create an unwarranted sentencing disparity.  In fact, given the guideline's requirement for concurrent sentences for multiple gun offenses, it is the government's recommendation that would create an unwarranted sentencing disparity.

The defense's recommendation falls within both the federal and D.C. guidelines.  This Court must consider the "need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  The Court will create an unwarranted sentence disparity if it sentences Mr. Kearney to consecutive sentences for the two firearms, primarily because the guidelines advise the opposite.

If these offenses had both been charged federally and sentenced in a single proceeding: 1) They would not group under §3D1.2; 2) The Court would apply the **multiple-count adjustment (§3D1.4)**, increasing the offense level to reflect separate incidents; and 3) The Court would ordinarily impose **concurrent sentences under §5G1.2**, unless consecutive terms were necessary to reach the total punishment. This framework applies even where, as here, the offenses are separated in time and factually distinct.

*First*, the offense do not group under §3D1.2 because the offenses did not involve the same act or transaction and because the substantive guideline involved (2K2.1) is covered by the grouping subsection.

*Second*, under §3D1.4, the second firearm offense is equally serious resulting in the counting of 1 Unit to increase the Group with the highest offense level. The table in §3D1.4 requires no increase in offense level.

*Third,* under §5G1.2, the sentences for each firearm are to be imposed concurrently. U.S.S.G. §5G1.2, Application Note 1: ("This section applies to multiple counts of conviction (A) contained in the same indictment or information, or (B) contained in different indictments or information for which sentences are *to be imposed at the same time* or in a consolidated proceeding).

In analogous circumstances, the Guidelines direct courts to approximate the sentence that would have been imposed had all offenses been sentenced together. U.S.S.G. §5G1.3(d). That

"as if sentenced together" framework provides the most principled basis for determining the appropriate sentence here.

If these offenses had both been charged federally and sentenced in a single proceeding, they would not group under §3D1.2; the Court would apply the multiple-count adjustment (§3D1.4), increasing the offense level to reflect separate incidents; and the Court would ordinarily impose concurrent sentences under §5G1.2, unless consecutive terms were necessary to reach the total punishment. This would occur even where offenses are separated in time, and factually distinct.

Despite the government's claims, the guidelines do not default to consecutive sentencing. Instead, they incorporate the additional conduct into a higher advisory range when required by the grouping rules.  The remainder of the government's concerns are already built into the guidelines' structured punishment for gun offenses. The Court should follow that principle here to avoid creating disproportionate punishment and unwarranted sentencing disparities.

The government argues that these offenses occurred two years apart and involved different firearms and the Court should thus impose consecutive sentences.  But the guidelines counsel the opposite because it already considers the seriousness of firearm possession and the presence of multiple incidents through offense-level increases. Thus, to then impose fully consecutive sentences would compound that punishment in a way the Guidelines themselves avoid, resulting in a sentence greater than necessary to achieve the purposes of §3553(a). Put differently, consecutive sentences would not merely recognize separate conduct—they would overweigh that conduct as compared to the intent of the Guidelines.

As a result, imposing fully consecutive sentences here—based solely on the dual federal/D.C. Code posture—would produce a materially harsher outcome unrelated to

18

culpability. A sentence of 18 months incarceration, for each offense, to be run concurrently, would serve the purposes of the 3553 factors while avoiding overcounting and an arbitrarily harsh sentence.

No circumstances here would justify a particularly harsh sentence. Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

Over the last five years, courts have been increasingly imposing non-government sponsored below guideline sentences in firearm cases. *See* Quick Facts, Felon in Possession of a Firearm https://www.ussc.gov/research/quick-facts/section-922g-firearms. In 2023, courts imposed sentences that vary from the guidelines in over 40 percent of these cases, 89% of which varied downward. *Id.* Of those offenders who received a below guideline sentence, the average reduction was approximately 36%. *Id.*

### IV.    U.S.S.G. § 2K2.1 Does Not Embody § 3553(a) Considerations or Result in Sentences That Might Achieve § 3553(a)'s Objectives.

When the Guidelines were first promulgated in 1987, to create a guideline for unlawful firearm possession, the Sentencing Commission attempted to "synthesiz[e] a coherent rationale that generally explain[ed] and [was] reasonably consistent with current sentencing practice." USSC, *Supplementary Report on The Initial Sentencing Guidelines and Policy Statements*, 18 (1987). The Commission acknowledged that there were not enough statistically-significant

19

patterns for sentencing prohibited firearm possession to create a clear guideline, noting that its "detailed statistical analyses . . . were of little value in explaining or rationalizing current sentences." *Id.* Although the Commission found that pre-Guidelines sentences had statistically-irrelevant ranges likely because of "the wide variety of circumstances under which these offenses occur," the Commission found that the "*actual or intended use* of the firearm was probably the most important factor in determining the sentence." U.S.S.G. § 2K2.1, cmt. background (1987). The Commission created guideline § 2K2.1 with a base level of 9 points, reduced to 5 if the firearm was possessed for lawful sporting use, or enhanced if the firearm was used in another offense. *See* U.S.S.G. § 2K2.1(a) (1987). Today, because of amendments made in 1991, a defendant's actual or intended use of the firearm plays no role in determining the Guideline range. Instead, prior criminal history and type of weapon are largely determinative. Moreover, under today's guidelines, a base offense level of 14, which is in Zone D, rarely allows a defendant to be sentenced to serve a non-prison term.

In 1989, the Commission increased the base offense level by 3 points, from 9 to 12, U.S.S.G. § 2K2.1(a) (1989), to reflect an increase in the statutory maximum penalty for unlawful firearm possession, which Congress doubled from 5 to 10 years in the Anti-Drug Abuse Act of 1988, *see* U.S.S.G. app. C, amend. 189, 100-101 (1989).

Then, in 1991, against the weight of empirical evidence collected from 1987 to 1990, the Commission completely erased and replaced the firearms guidelines. Similar to the now-discredited drug guidelines, the Commission dramatically increased the penalties proscribed under § 2K2.1 "in light of the Congressional sanction of a minimum 15 years for a prohibited person with three prior felonies of violence or controlled substance offenses." 1990 Commission Report 19. To create a framework "proportional" to the ACCA, the Commission doubled the

20

base offense level for a defendant with two prior crimes of violence or controlled substance offenses, from 12 to 24, effectively increasing the penalties prescribed for such defendants six-fold. *See id.* 19-23.

Since the Commission looked to the mandatory minimum ACCA sentence to create the firearm guidelines, and ignored "empirical data and national experience," the § 2K2.1 provisions "do not exemplify the Commission's exercise of its characteristic institutional role" or "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109 (internal quotation marks and citations omitted); *see also Gall*, 552 U.S. at 46 & n. 2. Instead, as demonstrated in this case, the Guidelines drastically overstate the seriousness of the offense by ignoring relevant considerations, such as the nature and circumstances of Mr. Hurtado's circumstances and the need for society to have individuals like Mr. Hurtado successfully reenter society.

Like in *Gall*, "[a]ny term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who . . . understands the consequences of his criminal conduct and is doing everything in his power to forge a new life." 552 U.S. at 44 (citation omitted) (quoting district court). Mr. Kearney requests a sentence of eighteen months, in order to begin the next stage of his life and to secure his productive place in the community. The requested sentence is no greater than necessary, and is sufficient for the purposes of sentencing.

## Conclusion

A sentence of eighteen months for each count, to be run concurrently, followed by a one year term of supervised release is a serious consequence that will more than adequately punish Mr. Kearney for his particular conduct and will also adequately deter any future wrongful

conduct.  Thus, for the reasons stated above, including Mr. Kearney;s history and characteristics, together with the other goals of sentencing, Mr. Kearney respectfully requests that the Court impose such a sentence.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500